21-5335-JGD

# AFFIDAVIT OF FBI TASK FORCE OFFICER MICHAEL MUOLO

I, Michael Muolo, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Police Detective in the Reading Police Department and have been assigned as a task force officer ("TFO") with the Federal Bureau of Investigation ("FBI") since October 2019. I am currently assigned to the Boston Field Office, Organized Crime Drug Enforcement Task Force ("OCDETF") Strike Force.

2. Prior to my current assignment as an FBI TFO, I was assigned as the Narcotics Detective in the Town of Reading and as a member of the Southern Middlesex Regional Drug Task Force. I graduated from the Transit Police Academy in 2012 where I was trained in criminal law, constitutional law, criminal investigations, motor vehicle law, and narcotics. I have completed specialized training in drug enforcement, including an eight-day school administered by the Municipal Police Institute on Street Level Narcotics Investigations. I have completed Massachusetts Top Gun Undercover Narcotics Investigators and Prosecutors Training Course and have also attended the two-week Criminal Investigations School. I have attended several Middlesex District Attorney's Office trainings on narcotics investigations and identification.

3. During my career in law enforcement, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug trafficking conspiracies. In the course of conducting criminal investigations, I have employed the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; conducting short-term and long-term narcotics investigations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and toll record data; conducting court-authorized electronic surveillance; and preparing and executing search warrants that resulted in substantial seizures of narcotics, firearms, and other contraband.

**PURPOSE OF THE AFFIDAVIT**

4.  I make this affidavit in support of an application for a criminal complaint charging Patrick O'HEARN (hereinafter, "O'HEARN") with conspiracy to distribute and to possess with intent to distribute 50 grams or more of a mixture and substance containing methamphetamine, and other controlled substances, in violation of 21 U.S.C. § 846, and possession with intent to distribute 50 grams or more of a mixture and substance containing methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and § 841(b)(1)(B)(viii) (the, "Charged Offense").  I also submit this affidavit is support of the pre-trial detention of O'HEARN.

5.  Based on the facts set forth in this affidavit, there is probable cause to believe that O'HEARN has committed the Charged Offense.

6.  The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses, among other things.  This affidavit is intended to show that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

**PROBABLE CAUSE**

*Investigation Background*

7.  In or about October 2020, a cooperating witness (the "CW") provided information to law enforcement describing drug trafficking activities of a large-scale methamphetamine supplier in the Boston area.  The CW has previously been convicted of drug trafficking and money laundering offenses in federal court, and is currently awaiting sentencing on those charges.  The CW is cooperating in the hopes of obtaining a reduction in sentence.  The CW has a history of drug use, including methamphetamine, hallucinogens such as LSD, ecstasy, and mescaline, as well as cocaine, heroin, and marijuana.  To the extent possible, the information provided by the CW has been corroborated through controlled purchases and surveillance.  The CW's previous cooperation with law enforcement resulted in the successful acquisition of approximately 64.4

grams of methamphetamine. I believe the CW to be an accurate and reliable source of information.

8. In late 2020, investigators identified Reshat ALKAYISI (hereinafter, "ALKAYISI") as a methamphetamine distributor, who distributes multiple pound quantities to customers throughout the New England area. Between February and April 2021, the CW, acting under the supervision and direction of investigators, made three successful controlled purchases of suspected methamphetamine—two directly from ALKAYISI and one that was negotiated with ALKAYISI and delivered by Brian KELEMAN (hereinafter, "KELEMAN"). All transactions were successfully audio and video recorded. Investigators have reviewed the recordings and confirmed that these transactions occurred with ALKAYISI and/or KELEMAN in a manner consistent with the descriptions provided by the CW. Field tests for all of the suspected methamphetamine were positive for the presence of methamphetamine. In total, investigators seized approximately 6 pounds of suspected methamphetamine in connection with the controlled purchases from ALKAYISI.

9. On May 5, 2021, the Honorable Denise J. Casper, United States District Judge, District of Massachusetts, authorized the interception of wire and electronic communications to and from a telephone used by ALKAYISI (hereinafter, "Target Telephone 1") for a period of thirty days. *See* 21-91306-DJC. Interceptions over Target Telephone 1 began on May 6, 2021. On June 4, 2021, Judge Casper authorized the continued interception of wire and electronic communications to and from Target Telephone 1 for an additional period of thirty days. Interceptions terminated on July 3, 2021.

10. During the periods of interception, investigators intercepted numerous wire and electronic communications during which ALKAYISI used Target Telephone 1 to arrange narcotics transactions and to discuss collecting drug proceeds for narcotics previously supplied on credit.

Investigators identified multiple regular methamphetamine customers of ALKAYISI, including Robyn COSTA (hereinafter, "COSTA"), Eric DANEAULT (hereinafter, "DANEAULT"), Andre WATSON (hereinafter, "WATSON"), Emil DZABIEV (hereinafter, "DZABIEV"), as well as O'HEARN.[1] Based on the investigation, I believe that O'HEARN assists ALKAYISI in storing methamphetamine and drug proceeds. Additionally, as will be described in detail below, I believe that O'HEARN allows ALKAYISI to use his residential address as the business address for his shell company ALKC LLC.

11.     Based on the intercepted calls, investigators learned that ALKAYISI traveled to California and Las Vegas, Nevada twice during the initial thirty-day period of interception. Each time, prior to his departure, based on interceptions and surveillance, investigators believe that ALKAYISI distributed methamphetamine to some of his customers, and that he collected (or attempted to collect) outstanding drug debts from customers. Interceptions also indicated that ALKAYISI met with multiple methamphetamine customers to supply methamphetamine upon his return to Boston. Following the deal with one customer on May 20, 2021, investigators stopped that customer and seized approximately one pound of suspected methamphetamine.

12.     In addition, on June 1, 2021, investigators seized four packages that contained a total of approximately 100 pounds of suspected methamphetamine from KELEMAN that he had picked up on behalf of ALKAYISI from a UPS store in Cumberland, Rhode Island. Following that seizure and the arrest of KELEMAN, investigators intercepted numerous communications

---

[1] Investigators have intercepted approximately 21 text messages to Target Telephone 1 from Chase QuickPay with Zelle notifying ALKAYISI that O'HEARN has paid him various amounts. Between May 7, 2021 to July 1, 2021, those payments total $25,100. Based on the investigation, I believe that these payments from O'HEARN to ALKAYISI were for methamphetamine. I also believe, based on precise location data for both Target Telephone 1, that ALKAYISI has met methamphetamine customers at O'HEARN's residence on multiple occasions to distribute methamphetamine.

during which ALKAYISI discussed KELEMAN getting arrested and the seizure. Based on the investigation, I believe that ALKAYISI's supplier shipped the packages containing the 100 pounds of methamphetamine that investigators seized.

13. On June 25, 2021, investigators obtained a warrant to search a UPS package destined for ALKAYISI. The package contained approximately 30 pounds of suspected methamphetamine. Following that seizure, investigators intercepted a call over Target Telephone 1, during which ALKAYISI and his supplier discussed the UPS package that the supplier sent, but that had not arrived. Based on the investigation, I believe they were discussing the UPS package that contained 30 pounds of suspected methamphetamine.

14. From controlled purchases, motor vehicle stops, and package seizures, investigators have seized a total of approximately 152 pounds of suspected methamphetamine. All of the suspected methamphetamine has been sent to the DEA Northeast Laboratory for forensic analysis. To date, investigators have received the results for two seizures, which confirmed the substances to be 100% pure methamphetamine.

*ALKAYISI Met a Regular Methamphetamine Customer Near O'HEARN's Residence*

15. Based on the investigation, I know that O'HEARN lives in an apartment at 501 Commerce Drive, Braintree, Massachusetts (hereinafter, "501 COMMERCE DRIVE"). On March 10, 2021, from approximately 7:18 p.m. to 8:14 p.m., location data for Target Telephone 1 established that ALKAYISI's phone was in the general area of Matthew Woods Drive in Braintree, Massachusetts, which is the location of the visitor's parking for 501 COMMERCE DRIVE. At the same approximate time, location data for a telephone used by one of ALKAYISI's regular methamphetamine customers (hereinafter, the "CUSTOMER")[2] indicated that the CUSTOMER's

---

[2] I am aware of the identity of the CUSTOMER, however, I am not disclosing the identity at this time because to do so would jeopardize the ongoing investigation. Based on the investigation, I know that the CUSTOMER is a

phone was in the same general area. At approximately 7:58 p.m., investigators observed ALKAYISI driving a Camaro (hereinafter, the "ALKAYISI Camaro") parked two parking spaces away from a rental vehicle with New York license plates. According to rental company records, the vehicle was rented to the CUSTOMER on that date. Investigators observed both vehicles parked in the visitor's parking lot for Building 4, the building where O'HEARN's apartment is located. Both vehicles were empty. Based upon my knowledge, training, and experience, as well as my participation in this investigation, I believe that ALKAYISI and the CUSTOMER met at O'HEARN's residence to exchange drugs or for the CUSTOMER to pay ALKAYISI for drugs previously supplied on credit.

*ALKAYISI Delivered Methamphetamine to O'HEARN and COSTA*

16. On April 3, 2021, court authorized GPS data for a GMC Acadia registered to Robyn COSTA (hereinafter, the "COSTA Acadia") and the ALKAYISI Camaro, in addition to location data for Target Telephone 1, placed ALKAYISI and COSTA in the same immediate vicinity in the area of Forbes Road in Braintree, Massachusetts. Shortly thereafter, GPS data for the ALKAYISI Camaro, as well as location data for Target Telephone 1, indicated that ALKAYISI was in the visitor's parking lot for 501 COMMERCE DRIVE, building four, which is where O'HEARN's apartment is located.

17. Using court authorized GPS tracking device on COSTA's Acadia, later that day, investigators located COSTA in Fall River, Massachusetts. At the request of investigators, Massachusetts State Police conducted a traffic stop of COSTA's Acadia. During the traffic stop, investigators seized approximately five pounds of suspected methamphetamine from the vehicle.

---

large-scale methamphetamine distributor in the Boston area. Within the last couple of months alone, I believe that AKAYISI supplied the CUSTOMER with at least 18 pounds of methamphetamine.

COSTA was arrested and charged with state controlled substance violations.[3] After being advised of her rights, COSTA told investigators that she met with her methamphetamine supplier earlier that day in Braintree, and that the supplier had given her the package that contained methamphetamine.

18.     Based upon my knowledge, training, and experience, as well as my participation in this investigation, I believe that ALKAYISI made deliveries of methamphetamine to COSTA and O'HEARN on April 3, 2021.

### ALKAYISI Delivered Methamphetamine to O'HEARN

19.     On May 12, 2021, interceptions and surveillance indicated that ALKAYISI made deliveries of methamphetamine to drug customers, including O'HEARN. Based on interceptions and surveillance, investigators believed that ALKAYISI first met with DANEAULT to supply DANEAULT with four pounds of methamphetamine ("I'll give you four").[4] At approximately 7:28 p.m., investigators observed ALKAYISI meet with DANEAULT at the parking lot of the Square One Mall in Saugus, Massachusetts. ALKAYISI was driving a black Jeep Grand Cherokee (hereinafter, the "Black Jeep").

20.     At approximately 7:40 p.m., investigators intercepted a call from ALKAYISI to Kelsie SEIDEN (hereinafter, "SEIDEN"), who investigators identified as one of ALKAYISI's significant others. During the call, ALKAYISI told her, "One down, two [U/I] to go." SEIDEN asked ALKAYISI if he was collecting money or just dropping stuff off, and ALKAYISI replied,

---

[3] ALKAYISI subsequently paid COSTA's bail.

[4] During one of the calls setting up the deal, ALKAYISI asked DANEAULT if he had tried his methamphetamine ("Have you had a chance to, um, you've seen my supply, right? My product?") and DANEAULT replied, "Oh yeah, yeah of course, uh everybody likes that stuff, yeah." ALKAYISI then said, "You're gonna get nice, big crystals." Based on my training and experience, I believe that, "nice, big crystals" was a reference to the quality of the methamphetamine.

"both." Based on the interceptions and my training and experience, I believe that when ALKAYISI said, "One down, two [U/I] to go," he meant that he had delivered methamphetamine to one customer (DANEAULT), and that he had two more customers to meet with. I also believe that he told SEIDEN that he was "both" delivering drugs and collecting drug proceeds. After that call, at approximately 7:44 p.m., ALKAYISI called Christina LUA (hereinafter, "LUA"), who investigators also identified as another one of ALKAYISI's significant others. During that call, ALKAYISI similarly told LUA, "I have one down two to go." I believe ALKAYISI was making deliveries of methamphetamine and he had two customers left to deliver to.

21. Investigators followed ALKAYISI as he drove from the Square One Mall in Saugus, where he met with DANEAULT, to a location in Dorchester, Massachusetts, where he met with another individual who investigators previously identified as an associate of ALKAYISI. Through electronic surveillance, investigators observed the Black Jeep depart the Dorchester area, and investigators subsequently followed ALKAYISI as he drove to 501 COMMERCE DRIVE. Based on the background of the investigation, the interceptions, and my training and experience, I believe that ALKAYISI retrieved methamphetamine from the associate in Dorchester prior to meeting with his next customer, O'HEARN.

22. Investigators observed ALKAYISI drive the Black Jeep from Dorchester to the large apartment complex within which O'HEARN's apartment is located. ALKAYISI parked and remained in his vehicle. At approximately 8:20 p.m., ALKAYISI called SEIDEN and told her he was at "Patrick's." Based on the investigation, I believe "Patrick" is Patrick O'HEARN. During his call with SEIDEN, ALKAYISI told her that "Patrick" was not home and he had to wait for him. Based on the call between ALKAYISI and SEIDEN, as well as a call intercepted earlier that

day with O'HEARN,[5] I believe that ALKAYISI went to O'HEARN's residence to deliver methamphetamine. At approximately 9:06 p.m., investigators observed O'HEARN exit a vehicle and walk toward the apartment complex. Investigators observed the Black Jeep unoccupied, and a short time later observed ALKAYISI exit the apartment complex, enter the Black Jeep, and leave the area. Based on the intercepted calls and surveillance, I believe that ALKAYISI supplied methamphetamine to O'HEARN.

*ALKAYISI Stored Methamphetamine at O'HEARN's Residence*

23.     Based on the investigation, I believe that ALKAYISI supplies O'HEARN with methamphetamine, and that O'HEARN allows ALKAYISI to store methamphetamine at his residence. For example, on May 19, 2021, investigators intercepted a series of calls and text messages over Target Telephone 1, during which ALKAYISI made arrangements for KELEMAN to deliver eight pounds of methamphetamine to the CUSTOMER. At approximately 11:42 a.m., investigators intercepted a call over Target Telephone 1 from ALKAYISI to KELEMAN, during which ALKAYISI told KELEMAN that he was going to "save you a trip to come meet up with me in Braintree." ALKAYISI then told KELEMAN that the CUSTOMER "is needing eight." During the remainder of the call, ALKAYISI directed KELEMAN to go to the "empty barn," with "the loft," and to "wrap up four in each bag." ALKAYISI then directed KELEMAN where to meet with the CUSTOMER. Based on the investigation, I believe that when ALKAYISI said that the CUSTOMER "is needing eight," he meant that the CUSTOMER wanted eight pounds of

---

[5] Earlier on May 12, 2021, investigators intercepted a call from ALKAYISI to O'HEARN. During the call, ALKAYISI told O'HEARN that he had been sending him messages, but had not heard back. O'HEARN replied, "I haven't seen or heard any messages," and ALKAYISI told O'HEARN to "look at them and call me back." I know that ALKAYISI and his associates often use encrypted messaging applications, such as Signal, to communicate. These encrypted messages are not subject to interception. Based on this exchange, I believe that ALKAYISI sent O'HEARN messages via an encrypted application regarding meeting to conduct a narcotics transaction.

methamphetamine. I believe that when ALKAYISI said he was going to "save" KELEMAN "a trip" to "Braintree," he meant that KELEMAN would not have to go to O'HEARN's residence to obtain the methamphetamine, and he then directed KELEMAN where to find eight pounds of methamphetamine at ALKAYISI's property in Rhode Island ("empty barn").

24. On May 20, 2021, investigators conducted physical surveillance on ALKAYISI outside of 501 COMMERCE DRIVE. At approximately 11:32 a.m., investigators observed ALKAYISI park the Black Jeep, exit the vehicle carrying a black briefcase style bag and a white object, and enter building four of 501 COMMERCE DRIVE, which is the building that O'HEARN's apartment is located. At approximately 12:22 p.m., investigators observed ALKAYISI leaving the building carrying a different and larger bag that appeared to be a soft sided cooler. Based upon my knowledge, training, and experience, as well as my participation in this investigation, I believe that ALKAYISI traveled to O'HEARN's apartment to collect methamphetamine for subsequent redistribution.

*ALKAYISI Used O'HEARN's Home Address as the Business Address for his Shell Company*

25. As described above, investigators identified 501 COMMERCE DRIVE, Unit 4204, as the residence of O'HEARN (hereinafter, "O'HEARN's Residence"). As detailed above, I believe O'HEARN is both a methamphetamine customer of ALKAYISI, and that he allows ALKAYISI to store methamphetamine at his residence. In addition, ALKAYISI listed O'HEARN's Residence as the principal office location for his shell corporation, ALKC LLC. ALKAYISI incorporated the business ALKC CORP in Rhode Island in October 2018, however, the business has since been administratively revoked for failure to file an annual report. In January 2021, ALKAYISI incorporated the business ALKC LLC in Massachusetts and listed O'HEARN's Residence as the principal office location. Per the Certificate of Organization filed with the

Massachusetts Secretary of State, ALKAYISI is the only listed manager associated with the ALKC LLC business, which is described in the filing as a "consultant service – consult and provide tools for farmers who produce vegetables." Based on a review of the business bank accounts, there is no evidence to suggest that the business has provided any consulting services or provided any farming tools or assistance to farmers. On the contrary, in addition to the methamphetamine operation, the only other business activities ALKAYISI is known to conduct is a marijuana grow operation in Rhode Island. ALKAYISI is not licensed in Rhode Island to operate a marijuana grow operation. Based on the investigation, I believe ALKAYISI uses ALKC LLC as a front to launder money from his illicit drug trafficking, and I believe ALKAYISI used O'HEARN's Residence as the business address in effort to conceal the drug proceeds from law enforcement detection.

*Search Warrant*

26.    On July 7, 2021, this Court authorized the search of O'HEARN's Residence. *See* 21-MJ-5315-JGD. On July 8, 2021, investigators executed that warrant.[6] Upon executing the warrant, investigators found approximately 842 grams of suspected methamphetamine, approximately 177.2 grams of suspected ketamine, as well as one small bottle labeled ketamine, approximately 65.4 grams of suspected cocaine, 22 assorted size bottles of suspected GHB, approximately 7.8 grams of suspected hallucinogenic mushrooms, and 21 suspected MDMA tablets. All of the estimated weights listed above include packaging. Each of the substances field tested positive for the substances detailed above. Investigators also seized $23,149 in U.S. currency.

---

[6] On July 8, 2021, investigators also executed a search warrant at ALKAYISI's residence in Rhode Island. As part of that search, investigators seized an AK-47, assault rifle, as well as a handgun and ammunition. Investigators also seized multiple controlled substances, including suspected methamphetamine.

**CONCLUSION**

27.     Based upon the evidence set forth above, as well as my knowledge, training and experience, I submit that there is probable cause to believe that O'HEARN committed the Charged Offenses.

Respectfully Submitted,

Michael Muolo
Task Force Officer
Federal Bureau of Investigation

Subscribed to and sworn before me telephonically in accordance with the requirements of Fed. R. Crim. P. 4.1 on __Jul 8, 2021__.

HON. JUDITH G. DEIN
United States Magistrate Judge